Pleased to court, your honors. My name is Bob Barr from Atlanta, Georgia. Co-counsel, along with my colleague, Rusty Murphy of Montana, representing Mr. John Stokes in this case. We have advised the clerk we'd like to have about five minutes for myself, and then Mr. Murphy will take about five minutes, and we'll reserve the balance for our time for rebuttal and other questions from the court. Thanks for traveling from Atlanta. You probably get the award for traveling the farthest for today's argument. Well, if that will help you, your honor, I'll take that. I don't know if it will help, but you'll still get the award. Thank you, your honor. It is a pleasure to be here, and what I would like to do is begin where the court requested that we begin in an order filed previously, and that is the question of mootness, and in particular in light of the recent Thorpe decision. We believe that this case is not moot either on substantive basis or equitable mootness basis. We begin our discussion with the court with where the judge below, that is District Court Judge Malloy, reviewed each of the grounds for mootness asserted by the appellees in this case, who, as this court recognized in Thorpe and as other cases, including the decision by Judge Malloy, has recognized the heavy burden on assertion of mootness lies not with the appellant, in this case the debtor, but with appellee creditors, and as the judge below found in addressing each one of the mootness issues or grounds that appellees brought, they had failed to meet their burden. Can I ask this question, Mr. Barr? Did Mr. Stokes seek a stay at any point? He did not seek a stay, your honor. Under Judge Gould's recent decision, doesn't the inquiry stop there? We do not believe that it stops there, your honor. As the court indicated in Thorpe, that certainly is a possible ground, and the court may stop it there, but not necessarily. And as Judge Malloy recognized also, and we believe consistent with the subsequent decision by this learned court in Thorpe, that you look beyond that. The reason in this case, your honor, that Mr. Stokes did not seek a stay is it would be a futile gesture in light of all that had happened in the case and his complete lack of resources, liquid assets, with which to post any supersedious bond that we believe the court definitely would have required. Aren't there provisions in the rules and case law surrounding a bond on a stay to take those factors into consideration? Can't a court have a reduced bond? Your client didn't even try. He did not seek that. He made a tactical decision. And looking back, certainly it probably would have been better to have done so. But Mr. Murphy and myself, and particularly Mr. Murphy, who has vast experience, both before that particular judge, Judge Kersher, and bankruptcy judges in law in particular, believe me, he could certainly address this as well. But I would state that we made a tactical decision at the time that it would in fact be futile, that there would in fact be a substantial supersedious bond required. It would be impossible for Mr. Stokes to have met that. And, again, as Judge Malloy indicated below, and we think, again, consistent with Thorpe, there are a number of other factors that the court looks at in terms of equitable mootness. As the judge below indicated, there was no surprise here. For example, with regard to Mr. Stokes seeking a lifting of the automatic stay, he had raised this ab initio from the very beginning of the proceedings against him repeatedly. And all of the other issues as well, as Judge Malloy indicated in his order of February 14th of last year, had in fact been raised. So the judge below, we think correctly, although we disagree with his ultimate conclusion, upholding the bankruptcy court's adoption of and ordering of the settlement agreement, that, among other things, extinguished Mr. Stokes' personal right to proceed with his appeal in the Montana State Court, inconsistent, we believe, with Stern v. Marshall, which we believe would be controlling on that point, that it could go forward, that is the appeal was proper, that Mr. Stokes, notwithstanding the fact that he had not jumped through the hoop of seeking a stay. With regard to the first issue, though, and that is the seeking of the lifting of the automatic stay, we believe we don't argue with the fact that the non-Title III judge, that is the bankruptcy judge, did have proper authority, certainly, to enforce the automatic stay and refuse to modify it. We disagree with the grounds on which he did, but that is within the purview of the non-Title III judge. What we believe strongly is not within the jurisdiction or purview of the Title III judge is to then, in July of 2010, to extinguish Mr. Stokes' right, personal right, not a core proceeding, not a core issue under Title XI, but a personal right under Montana law to prosecute the appeal of the defamation decision against him. In taking that away and directing Mr. Stokes not even be able to have any input into that under threat of contempt, we believe that Judge Kershaw, the bankruptcy judge, exceeded his authority. The most he could have done would have been to have issued a report and recommendation to Judge Malloy, the district court Title III judge. He did not do that. And Judge Malloy then subsequently simply adopted the order, ordering the settlement agreement. With regard further than Mr. Stokes. Doesn't that cure the Stern v. Marshall problem? No, we believe not at all because there has to be a proper basis under Stern v. Marshall for the Title III judge to have made a decision in that case. I think the court in Stern v. Marshall is very clear that the non-Title III judge, in addressing a non-core proceeding, which the state court defamation appeal action was certainly, it was not a public proceeding, that the judge has to provide a basis for the district court judge to render a decision. Simply not addressing it and simply ordering that his right to appeal be extinguished. Did you raise Stern before Judge Malloy? We did not, Your Honor, and we apologize. Hasn't that been waived? We believe that it has not been waived. It was a recent decision, and we admit certainly that that should have been addressed. The fact, though, is that the Supreme Court has weighed in subsequent to Judge Malloy's order. This came, I think, the decision in Stern v. Marshall was in the summer of 2010. January. I'm sorry, 2011. January of 11. And it was decided June 23, 2011. Okay. So the Stern v. Marshall case, it was subsequent to the court's decision. It was prior to our briefs in this case, and, again, we apologize. We probably should have raised it. It was a recent decision. We didn't catch it, but we do believe that the import of it that clearly indicates that Judge Kercher did not have jurisdiction to or authority to render that decision extinguishing Mr. Stokes' right is a fatal flaw, and the reason, in addition to those that Mr. Murphy will argue, to remand the case. Additionally, Mr. Stokes was never notified that the stipulation for dismissal was filed in the Montana Supreme Court, even though he clearly was an interested party. By the way, Mr. Barr, you're well into your co-counsel's time. I have every faith that the co-counsel will spot me at the additional time out of his, and we can certainly take a few minutes from our rebuttal. I do appreciate that because Mr. Murphy has some very important arguments. But we believe that this adds the fact that he was never notified, Stokes was never notified of the stipulation for dismissal, and it was, at best, a serious oversight on the part of the appellees that they related to the Montana Supreme Court that all interested parties had been notified and agreed to the stipulation. Mr. Stokes never agreed to that stipulation that the case would be dismissed. He raised it at every possible opportunity to protect his right to prosecute that personal right under Montana law. And if you'll please support, I will now turn the microphones over to my distinguished co-counsel. Thank you, Mr. Barr. And we'll hear from you on rebuttal, too. Mr. Murphy. Thank you, Your Honor. You don't get the award for coming the farthest. You came, like these other guys, from one of the nicest places. Thank you. I appreciate that. I'll try to – well, I will have to be very brief. The discharge in a bankruptcy is the most fundamental protection for the debtor. It is the primary reason why a person files bankruptcy, and it is not something that can be bargained with or sold or given away by the bankruptcy trustee, which is what happened here in this case. Was part of Judge Malloy's decision to say the case was not moot the conclusion or finding that there were other things to be done in this debtor's estate? I don't know if that was something that Judge Malloy focused on. There certainly were other things to be done, including things relevant to the question of discharge and the slander claim. The Gardners filed an adversary proceeding under Section 523 of the Bankruptcy Code to have their claim declared non-dischargeable, and under the precedence of the Ninth Circuit, they could rely on issue preclusion and claim preclusion to prevent the defendant from attempting to – or to prevent John Stokes from attempting to defend himself in that dischargeability action. And that is what – the reason why the total dismissal of the appeal is so detrimental and problematic in this case is because what the trustee did is he gave away, for no consideration at all, the ability of John Stokes to defend the integrity of his discharge. And that's important, not only because the Gardners have filed their 523 action, but the U.S. trustee filed an objection to discharge, and John Stokes could conceivably be stuck with a $3.8 million judgment that he can't contest in any court anywhere, even though he did have a right to appeal under Montana law. And what is particularly problematic about this, too, is if you read Judge Kershaw's decisions, the two orders in this case, he doesn't discuss why he exercised his discretion not to grant the motion to modify the stay. He did not discuss the points that Mr. Stokes, I believe, forcefully made that he has a separate interest in that appeal apart from the trustee. The trustee could have settled the counterclaims that were involved in that appeal very easily without getting rid of Mr. Stokes' ability to defend the jury verdict against him. And the trustee had the right to do that. We don't contest that. But he did not have the right to completely dismiss the appeal, and it was wrong for the trustee and the Gardners to represent the Montana Supreme Court, that all of the interested parties were there, and that the entire matter had been settled. The Montana Supreme Court, the question of liability was not at issue there. Is that right? It was just a question of damages. No, the question of liability was at issue. Liability was at issue there. Yes. And on the question of liability, did the trustee have an evaluation of the merits? The only evaluation he got was from us, and we obviously contested the merits. I also think even if he did have an evaluation of the merits, that's not relevant to the decision here, because it is John Stokes who has a personal right to the discharge, not the trustee. And if that would cause the Gardners not to buy the radio station, well, there are other potential buyers out there the trustee could have gotten. With respect to the sale issue, very briefly, we contend that there should have been exposure to the market. It was ten months between the time that this case was converted to Chapter 7 and the time that we were before the bankruptcy court on the – I contend it was a motion to approve a sale and not a motion to approve a settlement. And there was nothing done at all to attempt to market the property, and no valuation was done until a few days before the hearing to approve it, and that came only after we filed an objection to it. And that was by a real estate broker, and as far as – who was not able to testify because he wasn't present, wasn't called, and his opinions could not be tested. Based on the precedents that we explained, the trustee failed to exercise proper business judgment, and the court used the incorrect legal standard in approving that sale. Thank you. Okay, we'll go to the appellees, and we'll add an extra two minutes for the appellants on rebuttal so you can respond. So decide how the two of you are going to share that. Go ahead, and if the appellees need an extra two minutes, we'll give you that too. We want to hear everything to be said here. Thank you, Your Honor. May it please the Court, I am Robert Baldwin from Bozeman, Montana, arguing on behalf of the appellees. I represent the Gardners, Todd and DeVard Gardner claimants at counsel table, our other counsel representing the Boone-Karlberg parties, as they've been called, and the trustee himself representing himself. We have decided that I will make the primary argument, and I may or may not yield the time to them, depending on how things go here this morning. Thank you for this opportunity. I guess I would like to begin by addressing the Thorpe decision and the mootness argument. I want to make very clear that we believe that Judge Malloy erred, perhaps understandably, but he did err by essentially requiring complete inability to unscramble the eggs as the standard. That is not the standard. That is constitutional mootness. If you are unable to afford effective relief, it's constitutionally moot. This Court made clear that in Thorpe and in other cases, including Roberts Farm, that the inquiry is whether it would be inequitable to afford relief. That's why it's called equitable mootness. That's a different test from inability, which is constitutional mootness. Now, that's a significant distinction, because here there's no question that transaction has been consummated. Judge Hawkins, you asked a question about whether there were things left to be done below. In the estate administration, perhaps so. Regarding consummation of this deal, no. This deal was done. The Gardners paid $875,000 in cash. Counsel, if you're arguing for equitable mootness instead of constitutional mootness, doesn't that change our standard of review? I think you do. Since you're dealing in equity, doesn't that require us to be far more deferential to the district court than it would be if you were making a constitutional mootness argument? I don't believe so with respect, because the application of the wrong legal standard is reviewed de novo. That is essentially an abuse of discretion under this court's decision, an application of the wrong legal standard. And it's a legal question anyway, which one you apply. And Judge Malloy seized on cases that dealt with very, very complex, complicated matters and said that's kind of what it has to be for equitable mootness to apply. Now, he did not have the benefit of Thorpe and its reasoning. But Thorpe makes very clear, I believe, that this court chose its words carefully. This court said it will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. And I'm quoting, if a stay was sought and not gained, we will then look into whether etc. Part two, three, the test. There's an if at the start of that sentence. If, then we will. The implication is clearly, if not, then we won't. And that the failure to seek a stay is dispositive. Thorpe continued that the failure to obtain a stay does not require a conclusion of equitable mootness. Where parties use due diligence in seeking the stay, where they use due diligence, it's not necessarily moot. But the implication again, if they haven't used that due diligence, then it is. Roberts Farm talked about the equitable mootness as well. And while it didn't adopt a test that exactly mirrored Thorpe, it was not at all inconsistent. Roberts Farm involved many attempts to obtain a stay, albeit procedurally incorrectly. And Roberts Farm had some pretty harsh words to say about counsel, about how they had tried to obtain a stay via mandamus instead of appeal and so on. But the bottom line is that it found that it was equitably moot, because they had not properly sought to obtain a stay, including seeking relief from the circuit justice. So even if you try to get it from the bankruptcy court and the district court and the Ninth Circuit, and you don't get it, you still have to go to the circuit justice. Now, I want to address the excuse here that, well, gosh, it would have been futile and we didn't have the money. Well, this court in Thorpe cited Shattigay. I may be saying that name wrong. It's the Second Circuit case that adopted the equitable mootness analysis that you cited in a footnote. Shattigay, in turn, was discussed by a subsequent Second Circuit case, Metro Media Fiber Network, and that's 416F3136. Are either of these cases in your brief? No, and I'd like to explain that. You don't need to use your time to explain it, but when you're done with your argument, would you fill out a little sheet that the clerk will give you? She'll give a copy to your opponent? Yes, yes. When were these cases decided? Shattigay was a, well, I can say for certain standing here right now, it was prior to Thorpe because Thorpe cited it. They're both cited in Thorpe, right? I'm not sure Metro Media is. The Deutsche Bank versus Metro Media, it cites Shattigay also. What I did when I got your order, I read Thorpe, I read the cases it cited, I read the cases they cited, and by that process I got to Metro Media. Excuse me. I shepherdized Shattigay and found Metro Media citing it. But what the Seconds... You didn't file a 28-J letter. I did not. I prepared to argue it here. When you do that, you deprive us of the opportunity to study the case and be prepared. That's my only point. I apologize, Your Honor. Next time I will. What the Second Circuit said, though, we insist that a party seek a stay even if it seems highly unlikely that the bankruptcy court will issue one, and it cited Shattigay, that a party cannot escape the obligation to protect its litigation position by so facile an argument. Who wouldn't argue? I didn't have the money and I wouldn't have got it anyway. I mean, that's a very easy, as the court said, facile argument to make. And that doesn't cut it. Roberts Farms recognized that this places a heavy burden on the agreed party to go get a stay. The Ninth Circuit, that's not BAP, the Ninth Circuit decided, or recognized, that's a heavy burden we put on appellants to get a stay or risk having your appeal mooted. But it said, and I'm quoting, this is justified to prevent frustration of orderly administration of estates. So, yeah, it is a burden. But you got to do it and the burden is justified. That's what this court said in Roberts Farms to protect the orderly administration of the estate. This case is a perfect example of what would happen if this is not equitably moot. If this court were to reach the merits, and if we reach the merits, we think you should affirm nonetheless. But if this court were to reverse, the Gardeners, understand, had an excess of $4 million worth of claims. They, including the defamation judgment and other prior judgments, they surrendered that and $2.5 million of that and agreed to take a $1.5 million unsecured claim. In addition to that $2.5 million claim reduction, they wrote a check for $875,000. They went out and got a loan and gave a security interest to the creditor. The trustee agreed to this and Boone Carlberg, the first security holder, the pension plan in the real property, the first security holder, agreed to this. When all this got approved, what happened was Gardeners wrote this check. The trustee had a carve-out, which he has used. And the FCC approved the change, correct? The FCC approved the transfer. The license has been transferred. How do you unwind that? You can't. It's constitutionally moot as well. I mean, when we cited statutes in our briefs, there are statutes about seeking review of FCC decisions and a collateral attack in a bankruptcy proceeding is not one of the stipulated ways to do that. And there are other third parties involved as well. The trustees dispersed the funds to the first security holder, the Boone Carlberg parties, their pension plans, who in turn released their liens. And then the bank, which afforded the funds to the Gardener, obtained a first position lien on this property, it thinks. If you undo it, if you undo this transaction, how's that going to get undone? Is Boone Carlberg going to get back in first position and this lender finds itself in a second position for $875,000? Boone Carlberg then dispersed the money to his plan participants, some of whom have made withdrawals. How are we going to unscramble those eggs? Those are the problems that make it inequitable. Inequitable. Now, in Thorpe, this court talked about, well, we can fashion relief. Here's how the court could fashion relief. And there was only so much of the insurance funds paid in. The court could change the valuation methodologies going forward and so on and so forth. But there the parties had sought a stay. The insurers in Thorpe had tried their best to get a stay, including from the circuit justice. It was not inequitable to undo things there if they could be undone. So this court said it's not constitutionally moot because it's not impossible. Relief can be fashioned. Granted, it'll affect some people. Now, you don't have to go through that inquiry if there's been absolutely no attempt to seek a stay. If you look in Shattigay, again, that's the second circuit case this court relied upon in Thorpe. The last couple paragraphs of that case cite numerous cases for the proposition that there is a strong presumption of mootness where there's no attempt to seek a stay. It does not require a finding of inability to afford relief, and that if there is no stay sought, that's the end of the analysis. That's perfectly consistent with Thorpe. In short, and I don't want to spend all my time on Thorpe, but this court seemed to be rather interested in it, and it is, I think, dispositive. I wanted it to be addressed, but you shouldn't spend all your time on it. The Stern v. Marshall argument was never raised in the briefing in this case. Sitting at the council table here 10 minutes ago was the first time I heard that anyone contended it was relevant. Now, what – but it's not. Judge Kershaw did not make any decision about the state law defamation claim. He made – and that's what Stern v. Marshall might address if he tried to decide the merits of that claim. What Kershaw made decisions about was settlement of a claim against the estate by the trustee. That is the quintessential core proceeding that is within the jurisdiction of an Article I judge. Stern notwithstanding. Stern never changed that. So the Stern v. Marshall argument is as flawed as it is new. The argument that the bankruptcy court and the trustee and so on bargained away Stokes' discharge right is just smoke and mirrors. Mr. Stokes still has a full right to a discharge, unless someone else – it may be the Gardeners, it may be not – file a complaint, and they have filed it, and prove that he fits – that his conduct fits within the exception to discharge, convincing the bankruptcy judge to deny discharge. Nothing we have done changes that. In fact, when Mr. Stokes in his opening brief in this case said, well, gosh, there might be preclusive effect, issue a claim preclusion from the defamation claim, that it entails a finding of malice, therefore it's claim – it's issued preclusion, and my discharge is automatically denied, we filed in our response brief, we said we waive the right to rely upon claim and issue preclusion. Isn't part of your argument seeking affirmance on the merits that the bankruptcy judge gave full consideration to the merit or lack of merit in the appeal of the defamation judgment? Absolutely. And there was a statement in counsel – Is that right in the heart of Stern v. Marshall? No, that's in the heart of the ANC factors about the likelihood of success. That is a core issue. No, part of your argument, and I may not have put it correctly together, isn't part of your argument that above and beyond all other reasons to affirm on the merits is that the bankruptcy court properly assessed the merit or lack of merit or chances of reversal on appeal of the defamation judgment? That's part of your argument, isn't it? It is. And what's the – after Stern v. Marshall, what's the jurisdiction of a bankruptcy court to decide an issue like that? Because that is a core matter. We're dealing here with a claim against the estate that was tried in state court. Judge Kershaw didn't reverse or in any way decide the merits of that case. What he did was – and I would revise the standard. It's an abuse of discretion, not whether he properly did it, but whether he abused his discretion in doing it. He properly examined whether the trustee was acting properly. I believe there's another layer of discretion there in settling a claim against the estate. Many claims against the states are based on state law, either statutory or common law. And if that's a Stern v. Marshall question, then the bankruptcy court system comes crumbling down because courts always have to look at claims against the estate. Can they be settled? That was the great fear after the Supreme Court decided Stern, that it would wreak havoc in the relationship between bankruptcy judges and district judges. And Stern v. Marshall made very clear it deals with one specific subsection of Section 157 that says state law counterclaims are automatically court proceedings. And it said this will not change the division of labor all that much. I think that's pretty much a verbatim quote. The United States Supreme Court was not of the opinion that it had changed things radically. That's something bankruptcy practitioners have perhaps obsessed about. But it's not what the U.S. Supreme Court said. Your time is up, but we're going to give Mr. Barn, Mr. Murphy, a couple of minutes extra. So if you want a couple of minutes, you've got it, Tim. Okay. Thank you, Your Honor. That's very gracious. I will make it quick. There was a statement at counsel's table that the trustee had no authority or had done no investigation about the validity of the state court appeal, other than Mr. Barr's memo. That's not true. The testimony in front of the bankruptcy court was that Mr. Samson had talked to Mr. Stokes' trial counsel, the one who tried the defamation case, Mr. Pascal. He talked to him. And Mr. Samson testified at the hearing, that did not make me feel good about our chances for success on appeal. Another thing about the Barr memo, if you will, that was simply in the record because it was stapled to a brief that was filed. That's the only bona fides of that memo. If you look at the very first footnote, it says, by the way, we haven't looked at the record. I don't think you want to get into a debate about the validity of Mr. Barr's analysis of the state court proceedings, but by its own admission, they hadn't looked at the record when they wrote those musings about what might be possible bases for appeal. There was also a statement that there was no consideration for bargaining away Mr. Stokes' appeal rights. Well, excuse me, his right to a discharge. That's wrong on many levels. His right to a discharge was not bargained away. He'll still get it unless someone proves under the bankruptcy code that he's not entitled to it. But there was consideration. There was consideration of reduction and a judgment of $2.5 million plus $875,000 cash. This brings me to my final argument. There's no evidence in the record that this is a bad deal for the bankruptcy estate. The interests of creditors are paramount in these considerations. The trustee has a duty to maximize the value to the estate for the unsecured creditors. He got an $87,500 carve-out out of this deal that he would not have had without the deal. He would have had to abandon the property. It was worth less than the first lien against it. None of the creditors would have gotten anything, and this would have been completely lost to the estate. As it was, Mr. Samson was able to salvage some value. Many of the cases talking about the sale versus settlement issue and the A and C factors, they look at, well, gosh, there was a party willing to pay more. Some of the cases involved just that. We don't have anything about that. Mr. Stokes complained about Mr. Samson having not done enough. He was at that hearing. He could have put on someone to testify as to value. There's no evidence that anything was undervalued. I think we've got your argument. Thank you, Your Honor. Thank you very much for the argument. Now, could we – is that the time that was left? No, I added two minutes. Okay. Add another minute. We don't want to muzzle this English counsel. There you go. That should sort of equalize the time. Now, Mr. Barr, I hope you and Mr. Murphy have an agreement on splitting the rebuttal. We do, and I'm sure that co-counsel will hold me to it this time. Go ahead. Thank you, Your Honor. Just a couple of points in rebuttal following distinguished opposing counsel. We agree that this panel, this court in Thorpe, did choose its words wisely. And the fact of the matter is that distinguished opposing counsel, while correctly reading language from Thorpe, started a little bit too late. The court in Thorpe said, quote, a failure to seek a stake can render an appeal equitably moot, close quote. The court very carefully did not say it must or that it does render. Clearly, there is room there. With regard to counsel's argument, bold argument that the proceeding, the appeal of the state court defamation decision, verdict against Mr. Stokes was, of course, a court proceeding. That is simply not borne out either by any reasonable reading of a language of 28 U.S.C. 157 or anything in Stern v. Marshall. Quite the contrary. Although the district court, I'm sorry, the bankruptcy court, could consider a motion to terminate or modify the automatic stay as a core issue, that's not what we're contesting. We are contesting that they rendered that decision improperly, but not that they didn't have the jurisdiction. There is a method set out very clearly in 157C1 for a non-core issue, which this was. This was clearly a personal right of appeal pursuant to state court law that Mr. Stokes enjoyed. And although Judge Kershaw, the bankruptcy judge, did not use language that, well, I am extinguishing that claim, that is the very clear unavoidable net result of his order approving the settlement. So on those two points, we think that that opposing counsel fails in their argument. They have never shifted the heavy burden, which is on them to establish the basis for inequitable mootness that we believe does not exist here. In this case, it's not moot. And I would respectfully turn the remainder of our time over to distinguished co-counsel, Mr. Murphy. Thank you, Mr. Barr, and thanks again for traveling to see us. Thank you, Your Honor. Mr. Murphy. Thank you, Your Honor. Counsel said that the interest of the creditors is paramount in bankruptcy. Well, in many respects, that's true, but not in every single aspect of it. The interest of the debtor in his discharge is also paramount in bankruptcy. In fact, it's one of the most important reasons why we have a bankruptcy code. There actually are state laws that govern the distribution of assets for an insolvent debtor that many states have. They're called laws involving transfer of assets for the benefit of creditors. There's no discharge associated with that. What the federal bankruptcy law provides is the adequate stay protection and the discharge, and those are extremely fundamental interests and can't be played down as they are being played down here. There are two problems with the dismissal of the appeal. First of all, there is a difference between an objection to discharge, which is the objection to the discharge in general where no debt gets discharged and a complaint to determine dischargeability, which is brought by a single creditor to determine that that claim only is non-dischargeable. Both issues have been raised in adversary proceedings in this case. The Gardners first filed a complaint to determine dischargeability and then took over the U.S. trustee's objection to discharge. But the dismissal of the appeal affects both of these. First of all, it prevents, based on claim preclusion, initial preclusion, it prevents the ability to defend liability in the dischargeability claim, and secondly, it prevents the ability to deal with the damage issues, which is important in the objection to discharge, because while there may be an objection to a discharge, if the debtor is able to reduce damages from, say, $3.8 million down to $100,000, there's a huge benefit there. But he's denied that opportunity because of what happened in the Montana Supreme Court. And the only other thing I want to say as far as the waiver of issue preclusion and claim preclusion that they set forth in their brief, they don't explain how that works in a particular adversary proceeding. I don't know what that means. I don't know how far they think the bankruptcy court is going to be able to go when it gets into these issues dealing with dischargeability and the objection to discharge. And without that, there is still prejudice here. And one last point, it was a violation of the automatic stay to dismiss that appeal. Thank you. I thank all distinguished counsel for helping us out. The case of Stokes v. Sampson shall be submitted now, and in due course we'll try to give you a decision. Okay, thank you. The court is adjourned.
judges: Hawkins, Gould, Bybee